*E-filed 11/22/05*

FOR PUBLICATION

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

IN THE MATTER OF
THE EXTRADITION OF
JOSE ESPINOZA CHAVEZ

Case No. 05-70601 HRL

ORDER ON ACTION TO
CERTIFY FOR EXTRADITION

_____/

## BACKGROUND

On behalf of the Government of Mexico, the United States brought an action under 18 U.S.C. § 3184 seeking an order certifying to the Secretary of State that Jose Espinoza Chavez should be extradited to the State of Michoacan, Mexico, to stand trial for murder.

The murder occurred on October 22, 1997 next to a sports field during a festival day in Apatzingan, Michoacan, Mexico. The victim, Raul Mendoza Pantoja ("Mendoza"), was on foot. A truck occupied by three men pulled up nearby. A man in the truck, later identified by a witness to be Jose Espinoza Chavez, called out to Mendoza. When Mendoza approached, another man in the truck (subsequently identified as Ignacio Oseguera Chavez) shot and killed him. The truck sped away and the murderers escaped.[1]

//

---

[1] Oseguera Chavez was known to townspeople as either the uncle or the brother-in-law of Jose Espinoza Chavez. The court assumes that Oseguera Chavez and the third man in the truck are still at large. As we will see, the issue here is whether the other man in the truck, Jose Espinosa Chavez, is probably now before this court . . . or not.

1   With respect to the Jose Espinoza Chavez who called Mendoza over to be shot (the "murderer"), he was identified by name by at least one eyewitness because he was known by sight to be a resident of the nearby town of Naranjo de Chila. Although this court has only one eye witness identification and statement, it has other statements from local people, including Mendoza's relatives, who knew the murderer on sight because he was a local. Mendoza's sister (not an eyewitness to the crime) said he was: 20 years old, 5' 7" to 5' 8" tall, thin, chestnut hair, straight nose, no mustache. His nickname was "El Guerin" (meaning the "blonde" or "fair skinned" one).

The Mexican court issued an arrest warrant for Jose Espinoza Chavez, but the man was not to be found. People said he had run away to the United States.

Years later, probably in 2003 or 2004, a man named Jose Luis Espinosa Chavez, who lived with his family in Northern California, somehow came to the attention of either law enforcement, immigration authorities, or both. Then, the Mexican government became interested in him, conducted an inquiry, and concluded that he was the Jose Espinoza Chavez who was one of the murderers of Mendoza. Thus, the Mexican request for extradition. The man now before this court, Jose Luis Espinosa Chavez, will be referred to as the "accused."

This court heard the matter on November 2, 2005. The government's case was presented on papers. They included the pertinent treaty between the two governments and the official request for extradition. The heart of the presentation was statements and reports from investigating Mexican officials, witnesses, and people who knew the Jose Espinoza Chavez who lived in Naranjo de Chila. The accused himself also offered into evidence declarations and certified copies of documents. The government, however, objected to the accused's evidence, urging that it was outside the scope of an extradition hearing since it impermissibly sought to show a "defense" to the murder charge. The court reserved judgment on to what extent it might consider the accused's evidence. The matter was argued and submitted.

//
//
//
//

2

**LEGAL STANDARD**

The statute governing extradition, 18 U.S.C. § 3184, provides:

> Whenever there is a treaty or convention for extradition between the United States and any foreign government . . . any magistrate judge authorized so to do by a court of the United States, may . . . issue his warrant for the apprehension of the person so charged, that he may be brought before such justice, judge, or magistrate judge, to the end that the evidence of criminality may be heard and considered. . . . If, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention . . . he shall certify the same . . . to the Secretary of State.

In reviewing extradition requests, courts looks to whether: 1) the extradition judge had jurisdiction to conduct proceedings; 2) the extradition court had jurisdiction over the fugitive; 3) the extradition treaty was in full force and effect; 4) the crime fell within the terms of the treaty; and 5) there was competent legal evidence to support a finding of extraditability. *Zanazanian v. United States*, 729 F.2d 624, 625-26 (9th Cir. 1984). In this case, the accused stipulated to the first four requirements. Only the fifth, whether there is competent legal evidence to support a finding of extraditability, is in dispute.

The extradition treaty between the United States and Mexico provides: "Extradition shall be granted only if the evidence be found sufficient, according to the laws of the requested Party . . . to justify the committal for trial of the person sought if the offense of which he has been accused had been committed in that place." Extradition Treaty, May 4, 1978, U.S.-Mex., 31 U.S.T. 5059. The laws of the "requested Party," in this case the United States, require that the magistrate judge determine that there is probable cause to believe the accused committed the offense. *Quinn v. Robinson*, 783 F.2d 776, 783 (9th Cir. 1986). The judge's job is often described as "determin[ing] whether there is competent evidence to support the belief that the accused has committed the charged offense. *Id.* at 815. Traditionally, probable cause is defined as facts and circumstances which would lead a prudent person to believe that a crime was committed and that the subject of the investigation was connected with the crime. *Carroll v. United States*, 267 U.S. 132, 160 (1925).

An extradition hearing is not a criminal proceeding, and the person whose return is sought is not entitled to the rights available in a criminal trial. For example, the rules of evidence and civil procedure that govern federal court proceedings heard under the authority of Article III of the United States Constitution do not apply in extradition hearings. FED. R. EVID. 1101(d)(3); *In the Matter of the*

3

*Extradition of Smyth*, 61 F.3d 711, 720-21 (9th Cir. 1995). Additionally, the right of the fugitive to present evidence on his own behalf is limited: "he is not permitted to introduce evidence on the issue of guilt or innocence, but can only offer evidence that tends to explain the government's case of probable cause." *Hooker v. Klein*, 573 U.S. 1360, 1368 (9th Cir. 1978). "[E]vidence of alibi or of facts contradicting the demanding country's proof or of a defense such as insanity may properly be excluded from the Magistrate's hearing." *Shapiro v. Ferrandina*, 478 F.2d 894, 901 (2d Cir. 1973), citing *Charlton v. Kelly*, 229 U.S. 447, 456 (1913); *but see In re Extradition of Gonzalez*, 52 F. Supp. 2d 725, 739 (W.D. La. 1999) ("Evidence of an alibi defense is . . . admissible if it negates or obliterates probable cause, but not if it merely controverts the evidence of the requesting country").

The distinction between evidence that "explains" and evidence that "contradicts" is a murky one. One court notes that, although the difference is difficult to articulate, the purpose is reasonably clear: "to afford an accused person the opportunity to present reasonably clear-cut proof which would be of limited scope and have some reasonable chance of negating a showing of probable cause. . . . [T]he extraditee cannot be allowed to turn the extradition hearing into a full trial on the merits." *In the Matter of the Extradition of Sidona*, 450 F. Supp. 672, 685 (S.D.N.Y. 1978). That court found defendant's testimony that fraudulent wire transfers in Italy were in fact legal loans was contradictory rather than explanatory and thus not admissible at the extradition hearing. *Id.* at 687.[2] In contrast, courts have often allowed evidence of witness recantations at extradition hearings if the original statements were the basis for establishing probable cause. *See, In the Matter of the Extradition of Mainero*, 990 F. Supp. 1208, 1222 (S.D. Cal. 1997); *see also, In the Matter of the Extradition of Contreras*, 800 F. Supp 1462, 1469 (S.D. Tex. 1992).

It is beyond dispute that, in the present case, the government's evidence establishes probable cause that a man named Jose Espinoza Chavez, nicknamed El Guerin, a resident of Naranjo de Chila, participated in the 1997 murder of Mendoza. The open question, however, is whether the evidence

---

[2] This case introduced the idea of evidence that "negates" probable cause. " *Id.* at 685. It has thus been cited by courts to expand the definition of "explanatory" evidence, but one law journal article argues that the case was actually meant to narrow that definition, evinced by the deciding court's refusal to admit the disputed evidence. Jacques Semmelman, *The Rule of Non-Contradiction in International Extradition Proceedings: A Proposed Approach to the Admission of Exculpatory Evidence*, 23 Fordham Int'l L.J. 1295, 1316-17 (2000).

4

supports the conclusion that the accused is probably that Jose Espinoza Chavez. To answer that requires a careful review of the government's evidence matching up the murderer and the accused.

## DISCUSSION

The accused was born in Purepero, Michoacan on May 15, 1973.[3] Purepero is approximately 200 kilometers from Naranjo de Chila.[4] The accused's name is Jose <u>Luis</u> Espinoza Chavez. Back in l997, everyone connected with the government's evidence (police, judicial officials, witnesses, interviewees who knew the murderer), as well as every document prepared at that time, referred to the murderer without mention of a middle name.[5]

Nevertheless, for probable cause purposes, it is surely correct that the accused has almost exactly the same name as the murderer. And, since he would have been 24 at the time of the crime, his age is close to that of the murderer. Of course it is now more than 8 years later, but the court's observation of the accused in the courtroom did not suggest that he was "thin," nor did he have "chestnut hair." He <u>did</u> have a mustache. Little about his current appearance suggested that El Guerin would be an expected nickname.

There are two other pieces of evidence that bear on the question presented. One is a photo comparison. The other is a "positive" photo identification.

### A.    The Photo Comparison

The photo comparison is a purportedly scientific examination by a "physiognomic identification" expert of two photographs, called "Image 1" and "Image 2," each a frontal shot of a man's face and shoulders. After studying 25 specific facial features, the expert found that 15 features matched, 9 could not be determined, and 1 did not match. From that he concluded that the two men were "similar."

More basically, the court is told nothing about the origin of Image 1 and not much about Image

---

[3] The criminal complaint which initiated the proceeding in this court gives a date of birth of May 15, 1976. The court understands that this is a typographical error.

[4] This is a rough estimate based on the court's consultation of a Mexican atlas. At the hearing, the accused suggested these towns were 800 kilometers apart - an apparent exaggeration.

[5] Interestingly, the accused has submitted a copy of a birth certificate of <u>another</u> "Jose Espinoza Chavez" (no middle name), born January 17, 1974 in Naranjo de Chila.

5

2 either. Image 1 is described as a photo of the Jose Luis Espinoza Chavez "who was arrested in the United States." That must mean the accused, although the face in the photograph appears to be someone younger than the accused looks currently.[6] Also, the man in the picture is smiling. It looks more like a picture taken for some form of identification rather than one taken at the time of an arrest. Is it a picture of the accused taken years earlier, perhaps back in or before 1997? One can only guess, and - unlike the murderer in 1997 - this man does sport a mustache.

Image 2 is a near-complete mystery. Yes, it does look "similar" to the man in Image 1, but someone much older. The man in Image 2 appears much like the accused in the courtroom, and it is Image 2 that was attached to the criminal complaint and there described as being "Jose Espinoza Chavez."

So, by factoring in a dose of supposition, there is some evidence that Images 1 and 2 are the same man, and that man is the accused. This conclusion merely sets the stage for the other piece of evidence, evidence actually generated many months before the photo comparison.

### B.    The Photo Identification

The positive photo identification is where the case for probable cause hinges. The court has in hand the joint sworn statement of Bulmaro Mendoza Guillen (Mendoza), and Arturo Valencia Mendoza (Valencia). It was taken by a Mexican official on January 26, 2005, over 7 years after the killing. Both men are identified as farmers, illiterate, ages 54 and 44 respectively, from Naranjo Viejo (although the latter currently lived in Apatzingan). They were shown a photograph of a man. Their joint statement appears at page 50 in the evidentiary material submitted by Mexico. There is a photograph at page 51, another copy of Image 1 described above. Unfortunately, nothing tells the court that the photo at 51 is the photo the men were shown, and - once again - the court must make an assumption. Since the photo immediately followed the statement in the packet of papers, it must be the photo referenced in the statement? Maybe so.

//

---

[6] At the hearing, counsel for accused did state that Image 1 was a photo of the accused.

6

The problems with Image 1, identified in the previous section of this order, apply here as well. When and where was it taken? Is this the accused when he was younger, say back in 1997?

Mendoza and Valencia, relatives of the murder victim, were shown a SINGLE photograph (presumably Image 1). They did not witness the crime, but say they knew the Jose Espinosa Chavez who had lived in Naranjo de Chila and had murdered their kin. They do not say how well they knew him. It was over 7 years since they could have seen the man.

Furthermore, the statement is disturbingly ambiguous about what they were told either preparatory to or upon being shown the picture. The statement reads that they were shown the picture of the man "who killed our relative." Were they asked if this was the man? Or, were they told this was the man who killed Mendoza? Or, told this was a picture of someone named Jose Espinosa Chavez?

Since they were illiterate, they could not write the statement or read it. It pretty clearly is not in their own words. No one involved with the taking of the statement attested that it was read to them before they signed.[7] In pertinent part it reads:

> We appear before this Public Prosecutor's Offices in order to state the following: That at this moment this Regional Division of Process Control shows us Jose Luis Espinoza Chavez a.k.a. El Guerin's picture who killed our relative named Raul Mendoza Pantoja in Apatzingan, Michoacan, on October 22, 1997 and we fully recognize him because he is from Naranjo de Chila, Ranch, Municipality of Aguililla, Michoacan, and he lived there until the criminal events took place because he ran away to the United States.

The statement continues:

> So we fully recognize him without hesitating and we also want to state that we have been threatened several times by phone in case we identify the defendant, so we request you to put this information on records for the pertinent legal effects, requesting you to punish the wrongdoer Jose Espinzoa Chavez with the utmost severity of the law, who is trying to evade the law using another name.

The cryptic reference to telephone threats "in case we identify the defendant" (whoever that might be) does not add to the evidentiary value of the statement. The request to punish the wrongdoer "who is trying to evade the law using another name" positively detracts from it. The accused is not using another name; he is using his own and - so far as anyone knows - always has. What were the men

---

[7] In fairness, the statement's concluding words, translated as "lecture of it to the deponents who agree with its contents" may be meant to convey that message.

7

thinking? Or, what was the person who wrote up the statement thinking, or telling them, or showing them?

## ANALYSIS

This court is deeply troubled by the evidence of the photo identification of the accused by Mendoza and Valencia. Some of those concerns have already been identified. The worst is the decision to use a single photograph. One photo is highly suggestive. These men were primed to identify the man in the picture.

"[T]here is no *per se* rule that specifies which identification procedures are 'competent' for probable cause purposes." *Quinn v. Robinson*, 783 F.2d at 815. The reliability of the identification should be determined on the basis of the totality of the circumstances. *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972). In *Neil*, the Supreme Court set forth criteria that must be considered in evaluating whether the suggestiveness of a post-crime identification by an eyewitness led to a likelihood of irreparable misidentification. *Id.* This criteria includes the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. *Id.*

In the extradition context, several courts have determined that photo identifications by eyewitnesses were too unreliable to establish probable cause to extradite. In *In the Matter of the Extradition of Sandhu*, the court determined that a positive photo identification utilizing a single photograph - a mug shot - shown to an eyewitness a year and a half after the incident took place was insufficient, by itself, to establish probable cause. 1997 WL 277394 *7 (S.D.N.Y). In *In the Matter of the Extradition* of *Cervantes Valles* case, the court considered a photo array shown to eyewitnesses five years after the crime that contained *two* pictures of the respondent (out of seven), one of them being the array's only profile shot. 268 F. Supp. 758, 766-767 (S.D. Tex. 2003). This procedure, the court noted, "contravene[d] the best practices which law enforcement personnel are

encouraged, by the Department of Justice, to observe," and was so suggestive that it led to a "substantial likelihood of irreparable misidentification by the eyewitness. *Id.* at 774.[8]

In the present case, the unfairness of the single photo "lineup" would have been exacerbated exponentially if, as appears quite likely, the investigator told the men they were about to look at a photo either of the man who killed their relative or of "Jose Espinoza Chavez." If that happened, a positive identification was practically preordained, and such an identification alone could not satisfy the probable cause requirement.

The rule is that a court in an extradition hearing may not consider alibi evidence offered by the accused. The most frequently cited reason is that the extradition hearing could bog down into a mini-trial on the merits.[9] Accordingly, and despite the temptation, this court will not weigh against the government's evidence the alibi evidence that the accused has been living in California continuously since 1990, that he has a California drivers license first issued prior to 1997, and that his payroll records as well as a declaration of his then-supervisor say he was at work in California on the day of the murder in Apatzingan in 1997.

However, and again depending on one's view of not-too-clear authority, a distinction could be drawn between alibi evidence and evidence negating the government's evidence that the accused is THE Jose Espinoza Chavez involved in the murder. This is a slippery slope, because "negating" evidence just could be (prohibited) contradictory evidence under a different label. But, for what the comparison is worth, the Government of Mexico wants the man, nicknamed El Guerin, who lived in Naranjo de Chila, who had either an uncle or a brother-in-law named Ignacio Osequera Chavez, and

---

[8] While these cases are instructive, the *Neil* factors lose some of their relevance when the witnesses are not *eyewitnesses* to the crime, but are identifying someone they purportedly know. Here, the photo identifications by Mendoza and Valencia are only meaningful when paired with the statement of the eyewitness who actually saw El Guerin at the crime scene.

[9] However, there are some courts that, depending on one's perspective, either stretched this rule or concluded that it did not apply in the specific situation presented. *See, Cervantes-Valles*, 268 F. Supp. 2d at 766 (relying on "identity" evidence to determine that respondent was wrongly accused of the foreign crime on account of mistaken identity); *Gonzalez*, 52 F. Supp. 2d at 739 (considering alibi evidence because it "negated" probable cause); *Mainero*, 990 F. Supp. at 1208 ("[R]ecanting statements are relevant in [extradition] proceedings as they affect probable cause"); *Contreras*, 800 F. Supp. at 1469 (admitting witness recantation testimony where the indicia of reliability was on the recantation).

9

who did not have a brother. The accused offered innumerable declarations, school and medical records, and even a petition signed by a host of townspeople of Purepero that El Guerin was never his nickname, that he was born, raised, and lived in Purepero until he left to go to the United States, that he had no relative named Ignacio Osequera Chavez, and that in fact he did have a brother.[10]

## CONCLUSION

Ultimately, this court declines to weigh the evidence offered by accused against the evidence offered by the Mexican government. The Mexican evidence must stand or fall on its own. The court finds that it falls. (The correctness of that conclusion is, admittedly, reinforced by what has been offered by the accused.) There are too many gaps in the Mexican evidence, too much forced speculation and conjecture. The key photo lineup was no lineup at all and reeks with suggestibility. The evidence shows that the accused is maybe the man Mexico really wants, but it does not satisfy this court that the accused "probably" is him. Probable cause has not been established, and this court declines to certify the accused for extradition.

**IT IS SO ORDERED.**

Dated: 11/22/05

/s/ Howard R. Lloyd
HOWARD R. LLOYD
UNITED STATES MAGISTRATE JUDGE

---

[10]This court does recognize the possibility, however unlikely, that the accused's evidence may be an elaborate construct about either a fictitious Jose Espinoza Chavez or some Jose Espinoza Chavez other than himself.

THIS SHALL CERTIFY THAT A COPY OF THIS ORDER WILL BE SENT TO:

Jeffrey D. Nedrow       jeff.nedrow@usdoj.gov

Christopher C. Hall
333-B West Portal Avenue
San Francisco, CA 94127

Joseph Morehead
1155 Pine Street
San Francisco, CA 94109

* Counsel are responsible for providing copies of this order to co-counsel.

Dated:  11/22/05

/s/ RNR
Chambers of Magistrate Judge Lloyd

**United States District Court**
For the Northern District of California